Read, J.
(dissenting). In late 1993, then Governor Mario M. Cuomo signed a tribal-state compact with the St. Regis Mohawk Tribe to regulate Indian gaming at a casino on Indian lands, an activity sanctioned by a unique interaction between federal sovereignty over Indian affairs and our State’s Consti *834 tution and laws. Six years and millions of dollars later, plaintiffs in effect seek to shut down the casino. Under these circumstances, the claims should have been dismissed because the Tribe is an indispensable party. Disregarding the severe prejudice to the Tribe, our colleagues now hold that the 1993 Compact is void and unenforceable on separation-of-powers grounds. In the absence of a dismissal, we believe that this appeal presents two constitutional issues: we find that Governor Cuomo did not violate the separation-of-powers doctrine by signing the 1993 Compact; the 1993 Compact does not contravene article I, § 9 of the New York Constitution. Thus, we respectfully dissent.
Indispensable Party
The question of whether an Indian tribe is an indispensable party in a state court suit involving a compact entered into pursuant to the Federal Indian Gaming Regulatory Act (IGRA) (25 USC § 2701 et seq.) is a matter of first impression for this Court.[1] Other states’ appellate courts have considered this issue with mixed results.[2] No other state or federal court, *835 however, has grappled with indispensability in light of the extraordinary delay in bringing suit manifest here.* *[3]
A declaratory judgment does not require the Tribe’s presence in order to afford complete relief (see Klostermann v Cuomo, 61 NY2d 525, 538-539 [1984]); however, as a practical matter, an adverse declaratory judgment will “inequitably affect” the absent Tribe. Thus, under the facts of this case, the Tribe is a necessary party under CPLR 1001 (a), as the majority agrees.
Because the Tribe is a necessary party whose sovereign immunity prevents joinder, the statutory factors in CPLR 1001 (b) must be weighed to determine whether the litigation should continue without the Tribe. The second factor (the prejudice to the Tribe if the claims proceed in its absence) and the third factor (whether and by whom this prejudice might have been or may be avoided in the future) are related and, in our view, dispositive. After all, the Appellate Division acknowledged that the Tribe would have a viable claim for dismissal on the basis of laches if it were a party (Saratoga County Chamber of Commerce v Pataki, 275 AD2d 145, 158 [2000] [Saratoga I]).
“Laches is defined as ‘such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.’ * * * The essential element of this equitable defense is delay prejudicial to the opposing party” (Matter of Schulz v State of New York, 81 NY2d 336, 348 [1993], quoting Matter of Barabash, 31 NY2d 76, 81 [1972]). The 1993 Compact between the Tribe and the State was approved by the Tribe’s chiefs on June 9, 1993 and by Governor Cuomo on October 15, 1993. The Assistant Secretary of the Interior, Indian Affairs, approved the 1993 Compact *836 under IGRA on December 4, 1993. The Tribe opened its $30 million casino on April 10, 1999, five years later.
These lawsuits, however, were not commenced until September 1999, nearly six years after the 1993 Compact became final. Plaintiffs have never offered an explanation for their neglect to sue immediately after the Governor signed the 1993 Compact or the federal government approved it. If plaintiffs had sued even reasonably promptly, the Tribe could have avoided or delayed substantial investments of time and money to develop the casino. At the very least, the Tribe would have been put on notice of plaintiffs’ separation-of-powers allegations.
Moreover, the majority focuses its discussion of prejudice solely on whether or not “investors” (whoever they may be) have recouped their $30 million investment in four years (which, of course, is unknowable since the Tribe is not a party to this litigation). The majority ignores that the prejudice to the Tribe comprises more than dollars spent or profits made: our colleagues do not acknowledge the potential economic threat posed by this litigation to the casino’s 400-odd employees and to the Tribe’s long-term economic prospects.[4] The Tribe has dedicated 10 years to the pursuit of gambling as an economic development plan, and cannot now turn back the clock or “put[] genies back in their bottles” (Schulz, 81 NY2d at 348).
Nor did the Tribe execute the Compact or develop the casino in disregard of a known substantial separation-of-powers vulnerability. Rather, any such litigation risk that the Tribe might arguably have been aware of early on in 1993 was eclipsed by the Legislature’s prompt and consistent support of the 1993 Compact.
Specifically, on July 7, 1993, both houses of the Legislature passed the bill that became chapter 264 of the Laws of 1993 upon the Governor’s approval of it on July 13, 1993. This legislation granted the State Police and the Division of Crimi *837 nal Justice Services authority to undertake the responsibilities assigned to them by the 1993 Compact, which had been approved by the Tribe’s chiefs in the month prior to this legislation’s enactment. Section 1 of chapter 264 provides in its entirety as follows:
“In the event it is established that activity authorized under Public Law 100-497 [IGRA] shall be conducted in this state, notwithstanding any inconsistent provision of law, the New York state division of state police, on behalf of the New York state racing and wagering board, shall be granted access to the criminal history records of the division of criminal justice services, pursuant to subdivision 8-a of section 837 of the executive law, in connection with executing the responsibilities of the New York state racing and wagering board and the division of state police in regard to the regulation, oversight, licensing, or certification, including fingerprinting, criminal history record checks and background investigations of persons applying to engage in such activities. The division of criminal justice services shall submit a fingerprint card, along with the subject’s processing fee, to the federal bureau of investigation for the purpose of conducting a criminal history search and returning a report thereon.”
In addition, the Legislature for six consecutive years appropriated monies annually for the specific purpose of supporting oversight and regulatory activities assigned in the 1993 Compact to the Racing and Wagering Board and the State Police. These appropriations were made in anticipation of the opening of the Tribe’s casino and were enacted by the Legislature even though the opening was delayed.[5]
Moreover, these appropriations were not opaque or tucked away in some obscure corner of the budget: they were included with appropriations for programs managed by the Racing and Wagering Board and the State Police and were separately denominated as “Special Revenue Funds — Other, Miscel *838 laneous Special Revenue Fund — 339, Regulation of Indian Gaming Account.” Indeed, on July 12, 1993 — five days after both houses of the Legislature passed the bill that became chapter 264 of the Laws of 1993 — the First Deputy Director of the Division of the Budget wrote to both the Speaker of the Assembly and the Senate Majority Leader. He informed them, as required by law, of his intention to transfer monies from the special emergency appropriation in the already enacted fiscal year (FY) 1993-1994 budget to the Board and the State Police “to enable [these agencies] to engage in certain oversight and regulatory activities in relation to Class III gaming operations as set forth in gaming compacts between the [Mohawk and Oneida] Indian tribes and the State. These transfers are being made to the State Miscellaneous Special Revenue Fund, a Special Revenue Funds — Other and will be reimbursed by the Indian tribes.”
The majority downplays these appropriations. They might have had a point if the Racing and Wagering Board and the State Police had funded responsibilities assigned to them by the 1993 Compact under the authority of a more generic appropriation for agency operations. We wonder, however, how the Executive may ever be said to have acted without proper legislative authorization when carrying out activities for which the Legislature has earmarked funds.
The majority also relies heavily on a memorandum from Governor Cuomo’s Counsel to establish that the Tribe had fair warning of the 1993 Compact’s potential vulnerability. First, there is no reason to suppose (or, at least, no reason from the record) that the Tribe was contemporaneously aware of this memorandum, which is dated six days after the Tribe’s chiefs approved the 1993 Compact. Second, the Governor’s Counsel stated that while “the Governor has the legal authority under IGRA and state law to negotiate and sign an Indian gaming compact on the State’s behalf,” implementing legislation was needed for the Racing and Wagering Board to regulate Indian games; the State Police and the Division of Criminal Justice Services to conduct background investigations of casino employees and contractors; and the necessary appropriations.
The Legislature, in fact, enacted the kind of criminal justice legislation referred to by Governor’s Counsel (i.e., chapter 264 of the Laws of 1993) and made the requisite appropriations. The Legislature has never deemed it necessary to adopt legislation to state specifically that the Racing and Wagering Board may regulate games of chance on Indian lands just as it al *839 ready regulates charitable games of chance throughout the state (see e.g. L 2001, ch 383). Even if we suppose (again, we have no reason to know from the record) that the Tribe was told during negotiations that specific legislative approval or ratification of any tribal-state gaming compact was required to safeguard against a separation-of-powers attack, the Governor obviously changed his view.[6] Instead, he submitted implementing legislation, which the Legislature promptly passed. In sum, the Tribe reasonably relied on the State’s collective actions to conclude that the 1993 Compact was valid.
Finally, IGRA provides that tribes can only conduct class III gaming activities pursuant to a valid compact negotiated with the state in which the tribe is located (25 USC § 2710 [d] [1] [C]). Since the majority has declared the 1993 Compact void and unenforceable, the Tribe must either shut down the casino immediately[7] or conduct class III gaming in violation of IGRA and without any state regulatory oversight. The National Indian Gaming Commission has enforcement authority for IGRA, and can take action ranging from monetary penalties to forced closure of a casino where a tribe is in “substantial violation” of the statute (25 USC § 2713). The Commission did precisely this in United States v Santee Sioux Tribe of Neb. *840 (254 F3d 728, 731 [8th Cir 2001]), where the tribe accrued fines reduced to judgments totaling $1,182,000 and was forced to discontinue its class III gaming activities after a protracted legal battle (see also Pueblo of Santa Ana v Kelly, 932 F Supp 1284, 1290-1291 [D NM 1996] [noting United States Attorney’s warning that continuation of gaming activities in absence of valid compact would subject tribes and pueblos to federal criminal sanctions and forfeiture of their gaming devices], affd 104 F3d 1546 [10th Cir 1997]). The Tribe should not be exposed to the risk of these significant adverse consequences in light of plaintiffs’ prolonged delay in bringing these lawsuits.
A finding that the tribe is an indispensable party in these cases does not establish a per se rule that Indian tribes are indispensable parties whenever a claim is brought in state court involving Indian gaming. For instance, since only four months elapsed between the execution of the 1999 Amendment and the filing of plaintiffs’ complaints, the same analysis might have yielded a different result had the 1999 Amendment presented a live controversy.
The Appellate Division concluded in Saratoga I that the constitutional nature of plaintiffs’ claims outweighed any prejudice to the Tribe, and therefore the Tribe was not indispensable. The majority agrees, although in Schulz we held that a citizen-taxpayer’s 11-month postenactment delay in challenging the constitutionality of state financing measures sufficiently disrupted expectations so as to foreclose judicial review. In light of the “profound destabilizing and prejudicial effects from delay” (81 NY2d at 347-348) caused by these vastly more belated lawsuits, we can only conclude that the Appellate Division abused its discretion as a matter of law when it allowed the suit to continue without the Tribe.
IGRA/Separation of Powers
Our analysis of the merits starts with the Constitution’s implied separation-of-powers doctrine which “requires that the Legislature make the critical policy decisions, while the executive branch’s responsibility is to implement those policies” (Bourquin v Cuomo, 85 NY2d 781, 784 [1995]). The distinction between legislative (policymaking) and executive (policy implementing) functions is not black and white. Rather, “[i]t is only when the Executive acts inconsistently with the Legislature, or usurps its prerogatives, that the doctrine of separation is violated” (Clark v Cuomo, 66 NY2d 185, 189 [1985]; Matter of Broidrick v Lindsay, 39 NY2d 641 [1976]). While the major *841 ity labels as critical policy choices various subjects related to the operation of gaming activities and includible in a tribal-state compact, what plaintiffs challenge in these cases is more fundamental; namely, the decision to authorize on-reservation class III Indian gaming.
Any discussion of what “critical policy choices” were available to the Legislature on this score starts with the recognition that Indian commerce is an area “under the exclusive control of the Federal Government” (Seminole Tribe of Fla. v Florida, 517 US 44, 72 [1996]). “The traditional notions of Indian sovereignty provide a crucial ‘backdrop’ against which any assertion of state authority must be assessed” (Gaming Corp. of Am. v Dorsey & Whitney, 88 F3d 536, 547 [8th Cir 1996], citing White Mtn. Apache Tribe v Bracker, 448 US 136, 143 [1980]).
Faced with the question of whether a state could enforce its gambling laws on an Indian reservation, the United States Supreme Court in California v Cabazon Band of Mission Indians (480 US 202 [1987]) reiterated the long-established rule that “Indian tribes retain attributes of sovereignty over both their members and their territory, and that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States” (id. at 207 [internal quotation marks and citations omitted]). Moreover, “state laws may be applied to tribal Indians on their reservations [only] if Congress has expressly so provided” (id.).
In interpreting pre-IGRA law, the Supreme Court held that if a state merely “regulates” gambling (i.e., through its civil laws), tribes must be allowed to conduct gambling on their reservations free from the state’s gambling regulations. If, however, a state “prohibits” gambling (i.e., through its criminal laws), tribes are forbidden from gambling and the state may enforce its laws.
The most controversial aspects of IGRA, which codified Cabazon with important modifications and “expressly preempt[ed] the field in the governance of gaming activities on Indian lands” (S Rep No. 100-446, 100th Cong, 2d Sess, at 6, reprinted in 1988 US Code Cong & Admin News, at 3071, 3076; see Gaming Corp., 88 F3d at 544-549), cover class III gaming activities. These include pari-mutuel horse race wagering, lotteries, banking card games such as baccarat, chemin de fer and blackjack, electronic or electromechanical facsimiles of any game of *842 chance, and slot machines (25 USC § 2703 [7] [B]; [8]; 25 CFR 502.4 [c], [d]).[8]
IGRA continues the pro-Indian Cabazon holding by providing that class III gaming could be conducted in a “State that permits such gaming for any purpose by any person, organization, or entity” (25 USC § 2710 [d] [1] [B] [emphasis added]). IGRA also, however, pays heed to states’ apprehensions over unregulated Indian gaming by directing that a tribe can conduct class III gaming only pursuant to a “Tribal-State compact entered into by the Indian tribe and the State * * * that is in effect” (25 USC § 2710 [d ] [1] [C]).
Further, IGRA contains enforcement provisions to require that where a state permits class III gaming, it must negotiate in good faith with a tribe for a compact upon the tribe’s request (see Mashantucket Pequot Tribe v State of Conn., 913 F2d 1024 [2d Cir 1990], cert denied 499 ,US 975 [1991]). If negotiations prove fruitless, the tribe can sue the state in federal court. If the state invokes sovereign immunity, the Secretary has authority to mediate the dispute and impose compact terms.[9]
In summary, IGRA mandates that, if a state allows any class III gaming by any person, a tribe may seek to conduct the same games on its lands. Moreover, the Second Circuit has firmly rejected the notion (unsuccessfully advanced by the State of Connecticut) that a state that allows only charities to engage in regulated casino-type gambling prohibits class III gaming activities for purposes of IGRA (id. at 1031-1032). States that allow charities to conduct class III gaming must negotiate in good faith with a tribe wishing to do the same.
New York has not outlawed all gambling for more than six decades. For better or worse, New Yorkers have adopted a public policy that permits considerable gambling, although regulated. This public policy is embodied in article I, § 9 of the Constitution, which contains statements purporting to ban gambling, but — significantly, for purposes of IGRA — explicitly *843 authorizes four exceptions: (1) pari-mutuel betting on horse racing; (2) a state-operated lottery for education; (3) bingo for certain nonprofit organizations; and (4) “games of chance” for these same organizations. Games of chance are defined in the Constitution as follows:
“games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance.” (Art I, § 9 [2].)
The Games of Chance Licensing Law (General Municipal Law art 9-A) empowers the Racing and Wagering Board to “Supervise the administration of the games of chance licensing law and to adopt, amend and repeal rules and regulations governing the issuance and amendment of licenses thereunder and the conducting of games under such licenses” (General Municipal Law § 188-a [1]). Section 186 (3) of the General Municipal Law defines “games of chance” to include and exclude specific types of games; and delegates to the Board the authority to add such “other specific games” to the list of approved games of chance as fall within the confines of what is allowed in the Constitution (i.e. games “in which prizes are awarded on the basis of a designated winning number or numbers, color or colors, symbol or symbols determined by chance”). To similar effect, 9 NYCRR 5620.1 lists Board-approved games, but also authorizes “any other game of chance which has been approved in writing by the board.” (Subd [u].) Finally, article 16 of the Tax Law (the New York State Lottery for Education Law) authorizes the Division of the Lottery, among other things, to determine the type of lottery to be conducted (Tax Law § 1604 [a] [1]).
Plaintiffs do not challenge the constitutionality of any of the 26 specific games of chance listed in the 1993 Compact.[10] Plaintiffs do not contend that any of the games listed in the *844 1993 Compact are not among the numerous class III games that are already being conducted by nonprofit organizations and others in the state. Nor do they dispute the State’s evidence that, as of January 12, 2001, the Racing and Wagering Board had issued games-of-chance identification numbers to 6,840 organizations. According to the Board’s records for calendar year 1999, 2,125 authorized organizations were licensed to conduct bell jar games of chance. These organizations had a total handle of $298,598,154 from which a net profit of $51,646,037 resulted. With respect to other types of games of chance, $1,443,957 in net profits were raised by casino-style gaming from a handle of $3,011,913. According to the Division of the Lottery’s Annual Report, in FY 2002-2003 the Division awarded $3.1 billion in prizes. In short, while regulated by the Racing and Wagering Board and the Division of the Lottery, gambling is commonplace in New York notwithstanding article I, § 9’s general condemnation of it.
When Congress enacted IGRA pursuant to its plenary authority over Indian affairs, it legislated for all 50 states to allow sovereign nations (Indian tribes) to conduct class III gaming activities within states’ borders. In this situation, the “critical policy decision” challenged by plaintiffs — to authorize on-reservation class III Indian gaming — derives from the unique interplay between IGRA and our State’s Constitution and statutes. The Governor’s recognition that class III Indian gaming is mandated in New York by federal law, given policy choices embodied in the New York Constitution and state law, did not constitute policymaking. In executing the 1993 Compact, which regulates the Tribe’s conduct of class III gaming at its on-reservation casino, the Governor was merely implementing preexisting federal and state policy choices.
Whatever the case may be in other states, in New York, the Governor enjoys broad powers to enforce legislation and great flexibility in determining the methods of enforcement. For example, we have in recent years affirmed the Governor’s authority to create entire new agencies with new duties for consumer advocacy based principally on a legislative policy as general as article 20 of the Executive Law, which empowers the Consumer Protection Board to “promote and encourage the protection of the legitimate interests of consumers within the state” (Bourquin, 85 NY2d at 785-786; see also Clark, 66 NY2d at 190 [statute providing that State Board of Elections “shall have the power and duty * * * to encourage the broadest possible voter participation in elections” sufficiently articulated *845 legislative policy to support Governor’s creation of multi-agency voter-registration program]). The underlying legislative policy decisions here are more robust and detailed than were the legislative policy decisions implicated in Bourquin and Clark. On this record, we find no separation-of-powers violation.
Conclusion
The majority portrays the issues on this appeal as “fundamental and of immense public significance” (majority op at 814), which demand resolution despite the prejudice to the absent Tribe. The majority then stops short, leaving for another day “the question of the applicability of the State Constitution’s antigambling provision.” {Id. at 825.) Thus, our colleagues prolong constitutional uncertainty and create substantial hardships for the Tribe, not to mention for the casino’s employees and the surrounding communities. Moreover, because of the nature of plaintiffs’ claims, we do not see how the majority can sidestep deciding whether article I, § 9 prohibits class III gaming on Indian lands once the merits are reached.
In their briefs, during the course of two oral arguments and in several postargument submittals, plaintiffs continuously pressed their position that the class III gaming conducted at the casino under the 1993 Compact is prohibited by article I, § 9 of the New York State Constitution. Simply put, plaintiffs argue (and Judge Smith in his dissent agrees) that in light of article I, § 9’s ban of “commercialized gambling,” the Governor lacks any power to enter into a compact authorizing the Tribe to conduct Las Vegas-style gaming on Indian lands — with or without the Legislature’s approval or ratification. The State takes the opposite view.
The majority opines that, assuming the Legislature may constitutionally authorize the Governor to enter into a tribal-state compact for on-reservation class III gaming, the Legislature did not do so on the facts presented. In our view, the underlying constitutional issue is ripe for decision in this case once the merits have been reached. Further delay benefits no one — not those who may now seek legislative ratification of existing tribal-state compacts; not those who oppose Indian gaming.
For all the reasons given, we would reverse the order of the Appellate Division and dismiss both complaints.
Chief Judge Kaye and Judge Ciparick concur with Judge Rosenblatt; Judge Smith concurs in part and dissents in part
*846 in a separate opinion, dissenting as to part VIII of Judge Rosenblatt’s opinion; Judge Read dissents and votes to dismiss the actions in another opinion in which Judges Wesley and Graffeo concur.
Order modified, etc.

. In cases involving public utilities on tribal lands, the Appellate Division has concluded that sovereign immunity requires dismissal if the underlying dispute implicates “the rights and powers” of the tribe (see Niagara Mohawk Power Corp. v Anderson, 258 AD2d 958, 959 [4th Dept 1999] [affirming dismissal of complaint because dispute involving electrical service on reservation implicates rights and powers of tribe, and any judgment in its absence would be incomplete], lv dismissed 93 NY2d 958 [1999]; Anderson v Town of Lewiston, 244 AD2d 965 [4th Dept 1997] [affirming dismissal of complaint and denial of motion to intervene because dispute involving water service on reservation implicates rights and powers of tribe, and any judgment in its absence would be incomplete], appeal dismissed 91 NY2d 920 [1998]; see also Seneca v Seneca, 293 AD2d 56 [4th Dept 2002] [affirming denial of dismissal of complaint because dispute over agreement between purchaser and seller for sale of gas station situated on reservation does not implicate rights and powers of tribe]).

. Compare State ex rel. Clark v Johnson (120 NM 562, 904 P2d 11 [1995] [tribe not indispensable under New Mexico law where writ of mandamus sought because performance of act to be compelled not dependent on tribe’s will]) and Dairyland Greyhound Park, Inc. v McCallum (258 Wis 2d 210, 235, 655 NW2d 474, 487 [2002] [tribe not indispensable because otherwise “an important legal issue having significant public policy implications will evade resolution”], review denied 258 Wis 2d 110, 655 NW2d 129 [2002]) with State ex rel. Coll v Johnson (128 NM 154, 990 P2d 1277 [1999] [tribe indispensable in nonmandamus action seeking to halt Indian gaming in New Mexico subsequent to passage of legislation authorizing gaming compacts]); see also American Greyhound Racing, Inc. v Hull (305 F3d 1015 [9th Cir *835 2002] [tribe indispensable within meaning of federal rules where District Court was asked to decide if Arizona law permits Indian gaming]).

. See e.g. State ex rel. Clark v Johnson (petition filed less than two months after earliest compact executed); State ex rel. Blumenthal v Babbitt (899 F Supp 80 [D Conn 1995] [action to enjoin Secretary of Interior from accepting land into trust filed within days after Secretary’s announcement of his intention to do so]); State ex rel. Coll v Johnson (by 1999 state’s highest court considers challenge based on state gaming legislation enacted in 1997); Sac & Fox Nation of Mo. v Norton (240 F3d 1250 [10th Cir 2001] [action filed within 30 days to challenge Secretary of Interior’s decision to acquire land in trust for tribe and to approve gaming activities on land]); Dairyland Greyhound Park, Inc. v McCallum (injunction sought to prevent governor from renewing compacts expiring in 2003 and 2004); American Greyhound Racing, Inc. v Hull (injunction sought to prevent governor from renegotiating or renewing compacts expiring in 2003).

. As of April 12, 2002, the Tribe employed 418 people at the casino (see <www.mohawkcasino.com>). The 1993 gaming compact between the state and amicus curiae Oneida Indian Nation has been challenged on grounds essentially identical to those here, and the state lost at the trial court for essentially the same reasons (Peterman v Pataki, Sup Ct, Oneida County, July 17, 2002, McCarthy, J., Index No. 99-533 [time to perfect appeal extended until July 16, 2003]). The Oneida opened the Turning Stone Casino near Utica, New York on July 20, 1993. By April 2002, the Turning Stone Casino was reported to employ 3,300 people and to have an annual payroll of $70 million (George Keller, Gaming “Transformed” Oneida Nation, Post-Standard [Syracuse], Apr. 18, 2002, Neighbors West, at 7).

. Three of the four legislator plaintiffs voted in favor of chapter 264. None of the legislator plaintiffs voted against budget bills including the specific appropriations for the Racing and Wagering Board for fiscal years 1994-1995, 1995-1996, 1996-1997 and 1999-2000. Only one of the legislator plaintiffs voted against these budget bills in the remaining fiscal years.

. Contemporaneous newspaper accounts — of which the Tribe might have been aware — indicate that Governor Cuomo wanted the Legislature’s “response” to the compact that he was negotiating in 1993 with the Oneida Indian Nation before signing it, but that “[s]ome legislators said that [this was] an attempt to shift responsibility for a decision that could spark opposition”; and “[t]here are also questions as to whether the Legislature has any power to veto the compact” (James Dao, Accord Signed for a Casino in New York State, New York Times, Mar. 10, 1993, at Bl). When Governor Cuomo subsequently signed a tribal-state compact with the Oneida, it was reported as “something of a reversal by Mr. Cuomo, who had said that the Legislature needed to authorize state regulation of the casino before he could sign a compact,” but that “Republican leaders had said Mr. Cuomo was trying to spread political responsibility for gambling, and they refused to debate the issue until Mr. Cuomo signed the compact.” (James Dao, Cuomo Signs Pact with Indians for Casino in Upstate New York, New York Times, Apr. 16, 1993, at Al.) It was further noted that “Mr. Cuomo plans to introduce legislation giving him the authority to spend $2.5 million for state police officers and inspectors for Indian casinos.” (Id.) The spokesperson for the Senate Majority Leader was quoted as having said that “ ‘We’ll look at any legislation that he sends.’ ” (Id.) In fact, as noted in the text, the Legislature passed just such legislation.

. The Appellate Division did not anticipate this result: “It is important to note that plaintiffs do not seek to shut down the Tribe’s casino located on the Akwesane [sic] reservation insofar as it is operated in accordance with the original compact” (Saratoga County Chamber of Commerce v Pataki, 293 AD2d 20, 22 [2002] [Saratoga II]).

. We note that neither the 1993 Compact nor the 1999 Amendment authorized the Tribe to possess or operate slot machines at the casino.

. See 25 USC § 2710 (d) (7) (authorizing tribe to sue state in federal court where state fails to negotiate in good faith); Seminole Tribe of Fla. v Florida, 517 US 44 (1996) (invalidating IGRA, on Eleventh Amendment grounds, to the extent it allows tribes to sue states in federal court for a failure to negotiate in good faith); and 25 CFR part 291 (authorizing Secretary of the Interior to mediate and impose compacts if state invokes sovereign immunity); but see Florida v United States, Docket No. 4:99CV137-RH, ND Fla, filed Apr. 12, 1999 (challenging part 291).

. We express no opinion as to the constitutionality of any of the games included in the 1993 Compact. We note, however, that the question is not whether these games may be characterized as Las Vegas-style or commercialized gambling, but whether a particular game is a “game[ ] of chance” or “lottery” within the meanings of those terms in our Constitution and laws, and requires a detailed analysis of how each game is played (see e.g. Trump v Perlee, 228 AD2d 367 [1st Dept 1996] [electronic game, Quick Draw, offered in the State Lottery, contains all essential features of lottery and does not go beyond type of lottery contemplated by Constitution]).